**SCHEDULED FOR ORAL ARGUMENT ON SEPTEMBER 5, 2025**

**Nos. 25-5099, 25-5101, 25-5108 (consol.)**

# In the United States Court of Appeals for the District of Columbia Circuit

---

JANE DOE, et al.
*Plaintiffs-Appellees,*
*v.*
PAMELA BONDI, in her official capacity, et al.,
*Defendants-Appellants,*

---

JANE JONES, et al.
*Plaintiffs-Appellees,*
*v.*
PAMELA BONDI, in her official capacity, et al.,
*Defendants-Appellants,*

---

MARIA MOE, et al.
*Plaintiffs-Appellees,*
*v.*
DONALD J. TRUMP, in his official capacity, et al.,
*Defendants-Appellants,*

---

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA*

---

**AMICUS BRIEF OF DEE DEIDRE FARMER, LAMBDA LEGAL DEFENSE & EDUCATION FUND, ADVOCATES FOR TRANGENDER EQUALITY EDUCATION FUND, THE TRANSGENDER LAW CENTER, AND THE CENTER FOR CONSTITUTIONAL RIGHTS IN SUPPORT OF APPELLEES**

---

RICHARD SAENZ
WHIT WASHINGTON
LAMBDA LEGAL DEFENSE &
EDUCATION FUND, INC.
  120 Wall Street, 19th Floor
  New York, NY 10005
  (212) 809-8585

MICHAEL J. MESTITZ
WILLIAMS & CONNOLLY LLP
  680 Maine Ave S.W.
  Washington, DC 20024
  (202) 434-5000
  mmestitz@wc.com

## DISCLOSURE STATEMENT AND RULE 29 DISCLOSURES

No amicus has any parent corporation, nor any publicly held corporations owing more than 10% of its stock.

Pursuant to Federal Rule of Appellate Procedure 29, counsel for amici represent that all parties have consented to the filing of this amicus brief. Counsel further certifies that none of the parties or their counsel authored the brief in whole or in part, nor did any other person or entity other than amici or their counsel make any monetary contribution intended to fund the preparation or submission of this brief.

Amici listed on this brief respectfully submit that a separate amicus brief is necessary under D.C. Circuit Rule 29(d) because amici have unique expertise in the dangerous conditions that incarcerated transgender women face in prisons—especially men's prisons—and how the courts, Congress, and the Department of Justice have previously evaluated or addressed those risks. Ms. Farmer was the plaintiff in *Farmer v. Brennan*, and amici organizations on this brief all have experience litigating to protect the rights of transgender and incarcerated people. Amici are unaware of others intending to participate as *amici* in this matter who will address the same issues.

## TABLE OF CONTENTS

Page

INTEREST OF AMICI CURIAE ....................................................................1

INTRODUCTION ..........................................................................................4

ARGUMENT .................................................................................................5

I.   The Eighth Amendment Protects Incarcerated People from Officials'
     Deliberate Indifference to the Risk of Sexual Violence..........................5

II.  There Is an Obvious and Substantial Risk of Sexual Violence Against
     Incarcerated Transgender Women in Men's Facilities. .........................8

     A.   Courts have found that transgender women face a substantial
          risk of sexual assault, rape, and violence in men's facilities...........8

     B.   Congress found that transgender people are particularly
          vulnerable to sexual violence in prison in enacting the Prison
          Rape Elimination Act. ....................................................................10

     C.   The Department of Justice has repeatedly found that
          transgender women face a heightened risk of sexual assault in
          male prisons. ...................................................................................14

CONCLUSION...............................................................................................18

# TABLE OF AUTHORITIES

Page

## CASES

*Doe v. District of Columbia*, 215 F. Supp. 3d 62 (D.D.C. 2016) ....................7, 8

*Doe v. Wash. State Dep't of Corr.*,
   2021 WL 2453099 (E.D. Wash. May 17, 2021)................................................9

*Edmo v. Corizon, Inc.*, 949 F.3d 489 (9th Cir. 2020)...........................................2

*Farmer v. Brennan*, 511 U.S. 825 (1994) .......................................1, 4, 6, 7, 8, 11

*Fields v. Smith*, 653 F.3d 550 (7th Cir. 2011) .....................................................2

*Gilliam v. Department of Public Safety and Correctional Services*,
   2024 WL 5186706 (D. Md. Dec. 20, 2024)....................................................9

*Helling v. McKinney*, 509 U.S. 25 (2012).......................................................7, 18

*Lojan v. Crumbsie*, 2013 WL 411356 (S.D.N.Y. Feb. 1, 2013) .........................10

*Manning v. Griffin*, 2016 WL 1274588 (S.D.N.Y. Mar. 31, 2016)...................10

*Powell v. Schriver*, 175 F.3d 107 (2d Cir. 1999)...................................................9

*Tay v. Dennison*, 457 F. Supp. 3d 657 (S.D. Ill. 2020).........................................9

*Unique v. Claybaugh*, 712 F. Supp. 3d 1265 (N.D. Cal. 2024).........................10

*Warren v. District of Columbia*, 353 F. 3d. 36 (D.C. Cir. 2004).........................7

*Women Prisoners of D.C. Dep't. of Corrs. v. District of Columbia*,
   93 F. 3d 910 (D.C. Cir. 1996)...........................................................................7

*Zollicoffer v. Livingston*, 169 F. Supp. 3d 687 (S.D. Tex. 2016)..................2, 10

iii

Page

## CONSTITUTION, STATUTES, AND REGULATIONS

U.S. Const. amend. VIII ...................................................1, 2, 5, 6, 7, 8, 9, 11, 15

Prison Rape Elimination Act (PREA), 34 U.S.C. § 30301 *et seq.*..........11, 12, 13
    § 30301...................................................................................................11
    § 30302.............................................................................................11, 13
    § 30303...................................................................................................14
    § 30306...................................................................................................13
    § 30307...................................................................................................13

28 C.F.R.
    § 115.15...................................................................................................13
    § 115.31...................................................................................................13
    § 115.41...................................................................................................12
    § 115.42...................................................................................................12
    § 115.86...................................................................................................13

77 Fed. Reg. 37,109 (June 20, 2012)..........................................................12

## OTHER AUTHORITIES

Allen J. Beck, et al., *Sexual Victimization in Prisons and Jails
Reported by Inmates, 2011-12*, Bureau of Just. Stats. (2013) .....................16

Allen J. Beck, *Sexual Victimization in Prisons and Jails Reported by
Inmates, 2011-12: Supplemental Tables: Prevalence of Sexual
Victimization Among Transgender Adult Inmates*,
Bureau of Just. Stats. (2014) ...........................................................16

Emily D. Buehler and Shelby Kottke-Weaver, *Sexual Victimization
Reported by Adult Correctional Authorities, 2019–2020 – Statistical
Tables*, U.S. Dep't of Just. (2024),
https://bjs.ojp.gov/document/svraca1920st.pdf .............................................16

Federica Coppola, *Gender Identity in the Era of Mass Incarceration:
The Cruel and Unusual Segregation of Trans People in the United
States*, 21 Int'l J. Const. L. 649 (2023)..........................................................16

iv

Page

Other authorities—continued:

Amanda Graham, *Built Binary: Rethinking the Incarceration of Transgender Individuals Within a Dual-Gendered Prison System*, 58 Ga. L. Rev. 1307 (2024)..................................................................17

*National Prison Rape Elimination Commission Report*, Nat'l Crim. Just. Reference Serv. (2009), https://www.prearesourcecenter.org/sites/default/files/library/NPR EC-Final-Report.PDF ...................................................................14

Office for Victims of Crime, *Responding to Transgender Victims of Sexual Assault*, Office of Just. Progs., U.S. Dep't of Just. (June 2014)............................................................................................14

*Press Release*, U.S. Dep't of Just., *Justice Department Releases Final Rule to Prevent, Detect and Respond to Prison Rape* (May 17, 2012), http://www.justice.gov/opa/pr/2012/May/12-ag-635.html....................................................................................................12

*Sexually Abusive Behavior Prevention and Intervention Program*, Fed. Bureau of Prisons (June 4, 2015), https://www.bop.gov/policy/progstat/5324_012.pdf .....................................13

Statement of Interest of the United States, *Diamond v. Ward*, 2022 WL 3221224 (M.D. Ga. 2021), ECF No. 65 .........15

*Statistics*, Fed. Bureau of Prisons, https://www.bop.gov/about/statistics/population_statistics.jsp .................16

*Targets for Abuse: Transgender Inmates and Prison Rape*, Just Det. Int'l (2013), https://justdetention.org/wp-content/uploads/2015/10/FS-Targets-For-Abuse-Transgender-Inmates-And-Prisoner-Rape.pdf .................................................................17

*2015 U.S. Transgender Survey*, Nat'l Ctr. for Transgender Equality (2016), https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf ...................................................................17

Page

Other authorities—continued:

Vera Inst. of Justice, *Advancing Transgender Justice—Illuminating Trans Lives* 44 (Feb. 2024), https://justdetention.org/wp-content/uploads/2015/10/FS-Targets-For-Abuse-Transgender-Inmates-And-Prisoner-Rape.pdf.................................................................17

## INTEREST OF AMICI CURIAE

**Dee Deidre Farmer** is the first openly transgender plaintiff to bring a case before the United States Supreme Court in the landmark case *Farmer v. Brennan*, 511 U.S. 825 (1994). Her case has been relied on in thousands of cases concerning liability of prison officials who acted with deliberate indifference to a substantial risk of serious harm to an incarcerated person and was a major catalyst for the federal Prison Rape Elimination Act, which was signed into law in 2003. Ms. Farmer continues to advocate for incarcerated people and her interest in the case is to ensure the proper application of *Farmer v. Brennan* by the courts.

**Lambda Legal Defense and Education Fund, Inc. ("Lambda Legal")** is the oldest and largest national legal organization committed to achieving full recognition of the civil rights of LGBTQ+ people and everyone living with HIV through impact litigation, education, and public policy work. Lambda Legal works to identify and address the particular vulnerabilities of and disparities experienced by LGBTQ+ people in carceral settings and the criminal legal system more broadly. This work includes conducting and authoring Protected and Served 2022, a community survey and report on the high rates of discrimination and bias experienced by LGBTQ+ people and people living with HIV throughout the criminal legal system, and having appeared as counsel or amicus curiae in numerous cases involving the rights of

1

incarcerated transgender people to medically necessary health care, equal treatment, and protection from harm. *See, e.g.*, *Zollicoffer v. Livingston*, 169 F. Supp. 3d 687 (S.D. Tex. 2016) (transgender woman validly alleged that defendants knew of and disregarded a substantial risk of sexual assault based on their knowledge of prison sexual assault statistics, including the particular vulnerability of gay and transgender people); *Fields v. Smith*, 653 F.3d 550 (7th Cir. 2011) (striking down Wisconsin statute barring medical treatment for incarcerated people with gender dysphoria including hormone therapy and surgery); *Edmo v. Corizon, Inc.*, 949 F.3d 489 (9th Cir. 2020) (prison's failure to provide medically necessary gender affirming surgery was unconstitutional deliberate indifference).

**Advocates for Transgender Equality Education Fund ("A4TE")** is a nonprofit organization dedicated to advocating for the rights of transgender and nonbinary individuals across the United States. A4TE, through its predecessor organizations National Center for Transgender Equality (NCTE) and Transgender Legal Defense and Education Fund (TLDEF), has appeared as amici in cases regarding transgender rights in a wide range of state and federal courts at all levels. A4TE seeks to achieve full lived equality for the transgender and nonbinary community through impact litigation, policy advocacy, and education. A4TE's efforts focus on critical areas such as employ-

ment, healthcare, housing, conditions of confinement, education, identity documents, and public accommodations.

**Transgender Law Center ("TLC")** is the largest national trans-led organization advocating self-determination for all people.  Since 2002, TLC has been organizing, assisting, informing, and empowering thousands of individual community members towards a long-term, national, trans-led movement for liberation.  It also pursues impact litigation and policy advocacy to defend and advance the rights of TGNC people, transform the legal system, minimize immediate threats and harms, and educate the public about issues impacting our communities.  TLC has been counsel in groundbreaking transgender prisoners' rights cases addressing the very same issues raised in this brief.

**The Center for Constitutional Rights ("CCR")** is a national, not-for-profit legal, educational and advocacy organization dedicated to protecting and advancing rights guaranteed by the United States Constitution and international law.  Founded in 1966 to represent civil rights activists in the South, CCR has litigated landmark civil and human rights cases challenging arbitrary and discriminatory state policies, including policies that disproportionately impact incarcerated LGBTQI+ people.

## INTRODUCTION

The Eighth Amendment to the U.S. Constitution prohibits the government from inflicting "cruel and unusual punishment." U.S. Const. amend. VIII. And, as the Supreme Court has recognized, "[b]eing violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citation omitted).

In the decisions below, the district court found that "numerous government reports and regulations recogniz[e] that transgender persons are at significantly elevated risk of physical and sexual violence,'" JA187, and concluded that the Plaintiffs here had shown individual histories and circumstances that made them especially vulnerable. The district court's findings were consistent with decades of facts and law confirming that incarcerated transgender women who are housed in men's facilities are at a substantial risk of rape, sexual assault, and other violence. The pervasiveness of violence against transgender women in custody is clearly and widely recognized, and the risk of harm is obvious. Federal laws and the Eighth Amendment prohibit the government's indifference to the sexual violence transgender people are likely to face in custody and require officials to protect them from this well-known threat. Indeed, the Department of Justice itself has long recognized that nearly 40% of incarcerated transgender people housed in state and federal

4

prisons reported experiencing sexual victimization—a rate *ten times higher* than that reported by other incarcerated people.

The district court did not err in concluding that Plaintiffs were likely to succeed on their Eighth Amendment claims. These Plaintiffs have been individually assessed and assigned to women's facilities based on their unique circumstances. Each has resided successfully in women's facilities for long periods of time; some have *only* ever been housed in women's facilities. The Constitution requires officials to consider the specific risks these women face based on their individual circumstances, especially in light of the obvious and substantial risk of sexual violence against transgender women who are housed in men's prisons. Indeed, every branch of our government has for years recognized that transgender women are subject to special and serious risks when they are housed in men's prisons, and are at substantial risk of sexual victimization, and the district court correctly applied that conclusion given the Plaintiffs' individualized circumstance.

## ARGUMENT

### I.     The Eighth Amendment Protects Incarcerated People from Officials' Deliberate Indifference to the Risk of Sexual Violence.

More than thirty years ago, in a foundational case involving a transgender woman who was assaulted in a Bureau of Prisons men's facility in Indiana, the United States Supreme Court made clear that the Eighth Amend-

5

ment's proscription against cruel and unusual punishment requires prison officials to protect people in their custody from sexual and other violent assaults by other incarcerated people. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

In 1989, the Federal Bureau of Prisons incarcerated Dee Farmer, a Black transgender woman, in a men's penitentiary in Terre Haute, Indiana, known to be particularly violent, despite Ms. Farmer's well-known vulnerability to violence and sexual abuse. *Farmer*, 511 U.S. at 825, 829-31. After she was brutally raped and beaten while housed in the prison's general population, Ms. Farmer sued to vindicate her rights.

On June 6, 1994, the Supreme Court held that people who are raped while incarcerated due to the "deliberate indifference" of prison officials suffer cruel and unusual punishment under the Eighth Amendment. *Farmer*, 511 U.S. at 832-33. While "[p]rison conditions may be 'restrictive and even harsh,' . . . gratuitously allowing the beating or rape of one prisoner by another serves no 'legitimate penological objective[ ].' " *Id.* (citation omitted).

In the words of Justice Blackmun, *Farmer* was "a clear message to prison officials that their affirmative duty under the Constitution to provide for the safety of [incarcerated people] is not to be taken lightly" and clearly stated that, when vulnerable populations in carceral settings face an obvious and substantial risk of violence, "prison officials must fulfill their affirmative duty . . . to prevent inmate assault including prison rape, or otherwise face a

serious risk of being held liable for damages." *Id.* at 852, 858 (Blackmun, J.,
concurring).

Under this well-settled standard, prison officials violate the Eighth
Amendment when they demonstrate deliberate indifference to a substantial
risk of serious harm—that is, when they "know[] that inmates face a substan-
tial risk of serious harm and disregard[] that risk by failing to take reasonable
measures to abate it." *Farmer*, 511 U.S. at 837.  This deliberate-indifference
standard is "an objective standard": "It simply means that, faced with actual
or constructive knowledge that its agents will probably violate constitutional
rights, the [government] may not adopt a policy of inaction." *Warren v. Dis-
trict of Columbia*, 353 F. 3d. 36, 39 (D.C. Cir. 2004) (citing *Farmer*, 511 U.S. at
841).  It is sufficient that prison conditions "pose an unreasonable risk of seri-
ous damage" to an inmate's future health.  *Helling v. McKinney*, 509 U.S. 25,
35 (2012).  And in the wake of *Farmer*, courts have concluded that the risk of
sexual assault in prison is "without question a deprivation of rights 'sufficiently
serious' to violate the Eighth Amendment." *Doe v. District of Columbia*, 215
F. Supp. 3d 62, 74 (D.D.C. 2016) (citing *Farmer*, 511 U.S. at 852-53); *see also*
*Women Prisoners of D.C. Dep't. of Corrs. v. District of Columbia*, 93 F. 3d 910,
929 (D.C. Cir. 1996) (affirming district court finding that a pattern of sexual
assault "rose to the level of objective cruelty that violated the Eighth Amend-
ment.").

## II.    There Is an Obvious and Substantial Risk of Sexual Violence Against Incarcerated Transgender Women in Men's Facilities.

As a result of the *Farmer* decision, the public dialogue about prison rape and the legal landscape for prison assault cases transformed dramatically. Since then, courts, Congress, and the Department of Justice itself have acknowledged the well-known and pervasive risk that incarcerated transgender women face in male prisons.

### A.    Courts have found that transgender women face a substantial risk of sexual assault, rape, and violence in men's facilities.

Courts have consistently recognized that transgender people are "an identifiable group of prisoners who are frequently singled out for violent attack by other inmates." *Farmer*, 511 U.S. at 843. This is particularly the case when transgender women are housed in men's facilities—as many of Plaintiffs' own experiences tragically attest. Indeed, the consensus in lower courts is that the well-known risks to transgender women in prisons are sufficient to put prison officials on notice of transgender people's particular vulnerability to sexual violence. *See Doe*, 215 F. Supp. 3d at 75.

In *Doe,* the D.C. District Court held that a jury could find that the plaintiff was at identifiable risk of harm because she was a "young, small, feminine transgender inmate with breasts." *Id.* Those specific features, as well as "evidence that transgender women as a class face a heightened risk of prison

8

rape," provided sufficient evidence for a reasonable jury to find that the plaintiff was at substantial risk of rape. *Id.* "[K]nowledge of the inmate's own characteristics—such as being a transgender woman" can be sufficient for prison officials to infer the risk of assault. *Id.* at 76.

Thus, in assessing similar Eighth Amendment claims, "[c]ourts have routinely found that transgender prisoners are at increased vulnerability to abuse in the prison systems." *Doe v. Wash. State Dep't of Corr.*, 2021 WL 2453099, at *4 (E.D. Wash. May 17, 2021). Indeed, it has been "obvious" for decades that "under certain circumstances the disclosure of an inmate's . . . transsexualism could place that inmate in harm's way." *Powell v. Schriver*, 175 F.3d 107, 115 (2d Cir. 1999).

Several cases have underscored the well-known risk that transgender women face when housed in male facilities. For example, in *Gilliam v. Department of Public Safety and Correctional Services*, the court observed that two transgender women housed in men's facilities had adequately alleged "an unjustifiably high risk of harm to each [transgender] Plaintiff either was known or should have been obvious to the DPSCS officials involved in her housing placement and responsible for her safety." 2024 WL 5186706, at *12 (D. Md. Dec. 20, 2024). In *Tay v. Dennison*, the court observed that the defendant officials knew the plaintiff was "a transgender woman and is therefore particularly vulnerable in a men's facility." 457 F. Supp. 3d 657, 684 (S.D. Ill. 2020).

And in *Manning v. Griffin*, the court concluded that a transgender woman "was subjected to a heightened risk of harm as a transgender prisoner in a male prison." 2016 WL 1274588, at *7 (S.D.N.Y. Mar. 31, 2016).

This is by no means an exhaustive list, and it omits many other cases recognizing that transgender people more face a dramatically heightened risk of victimization in general.[1] As the district court below correctly found, however, that risk of harm is most profound when transgender women are placed in men's facilities, as the government proposes to do here—regardless of the individual evidence showing these Plaintiffs would be particularly at risk in a men's prison.

**B.    Congress found that transgender people are particularly vulnerable to sexual violence in prison in enacting the Prison Rape Elimination Act.**

In 2003, nine years after the *Farmer* decision, a bipartisan Congress unanimously passed the Prison Rape Elimination Act ("PREA") to combat the "epidemic character of prison rape and the day-to-day horror experienced by

---

[1] *See, e.g.*, *Unique v. Claybaugh*, 712 F. Supp. 3d 1265, 1273 (N.D. Cal. 2024) (citing defendants' "knowledge that transgender individuals suffer disproportionately from sexual assault during incarceration"); *Zollicoffer v. Livingston*, 169 F. Supp. 3d 687, 696 (S.D. Tex. 2016) (noting government statistics, trainings, and recommendations acknowledging transgender persons' susceptibility to sexual assaults in prison); *Lojan v. Crumbsie*, 2013 WL 411356, at *4 (S.D.N.Y. Feb. 1, 2013) ("[T]he argument that more than mere knowledge of Plaintiff's transgender status was required to put Defendant on notice of Plaintiff's vulnerability is spurious.").

10

victimized [prisoners]." 34 U.S.C. § 30301(12). In passing PREA, Congress took steps to ensure that prison officials adopt measures to protect vulnerable people, like plaintiffs here, from unnecessary risks of sexual violence. PREA illuminated the pressing national importance of preventing prison rape, and specifically recognized, consistent with court rulings, that sexual assault in prisons can constitute an Eighth Amendment violation. Indeed, one of the stated purposes of PREA is to "protect the Eighth Amendment rights of Federal, State, and local prisoners." 34 U.S.C. § 30302(6)-(7). And Congress underscored the significance of *Farmer* by expressly acknowledging in the statute that there, "the Supreme Court ruled that deliberate indifference to the substantial risk of sexual assault violates prisoners' rights under the . . . Eighth Amendment." *See* 34 U.S.C. § 30301(13) (internal citation omitted).

PREA and its implementing regulations (the "PREA Standards") acknowledge the serious threat of sexual victimization that transgender people face while incarcerated. After nine years of study and commentary by experts, the DOJ promulgated a comprehensive set of regulations implementing the Act in May 2012. *See Press Release*, U.S. Dep't of Just., *Justice Department Releases Final Rule to Prevent, Detect and Respond to Prison Rape* (May 17, 2012).[2]

---

[2] Available at http://www.justice.gov/opa/pr/2012/May/12-ag-635.html.

The PREA Standards recognize that transgender people have "particular vulnerabilities" to sexual abuse and sexual harassment. *See* 77 Fed. Reg. 37,109 (June 20, 2012) (explanatory text). They accordingly impose a mandatory obligation on the BOP to protect incarcerated transgender people who are especially vulnerable to sexual assault, including by screening incarcerated individuals to assess their risk of being sexually abused by other prisoners upon their initial intake screening, and any transfer to another facility. 28 C.F.R. § 115.41(a). Among the criteria that prison officials must use to assess an incarcerated person's risk of sexual victimization are "[w]hether the inmate is or is perceived to be . . . transgender." 28 C.F.R. § 115.41(d). Officials must also consider "[w]hether the inmate has previously experienced sexual victimization," and "[t]he inmate's own perception of vulnerability." *Id.* Under the Standards, an agency "shall make *individualized* determinations about how to ensure the safety of each inmate," and, "[i]n deciding whether to assign a transgender . . . inmate to a facility" must consider "on a *case-by-case basis* whether a placement would ensure the inmate's health and safety." 28 C.F.R. § 115.42 (emphases added).

The careful use of these classification and screening processes ensures that each person receives an individualized determination as to their risk of victimization. Here, as the district court acknowledged, all the Plaintiffs were classified and screened to determine their housing placements, based on a host

12

of individualized factors. As a result of that process, the government con-cluded that housing each Plaintiff in a woman's facility was the most appropri-ate and safest option.

In addition to the individualized screening and classification procedures, several other aspects of PREA and the PREA Standards acknowledge Con-gress's conclusion that transgender people are especially vulnerable to abuse in prisons.[3] And in passing PREA, Congress also created the National Prison Rape Elimination Commission ("Commission"), which has reached the same conclusion. The Commission is charged with investigating prison rape and creating binding "national standards for the detection, prevention, reduction, and punishment of rape." 34 U.S.C. § 30306, 30302(3). The Commission found that "the discrimination, hostility, and violence [that LGBT people] often face in American society are amplified in correctional environments and may be expressed by staff as well as other incarcerated persons." *National Prison*

---

[3] For example, prisons and jails must train staff specifically on searching transgender people, train them about communication with transgender peo-ple, and assess during incident reviews whether a person was targeted based on transgender status. 28 C.F.R. §§ 115.15, 31, 86. They must also ensure that transgender people be given safe opportunities to shower separately from other inmates, and may perform cross-gender searches only under specific cir-cumstances. 28 C.F.R. § 115.15(d). These standards are binding on the BOP and are expressly incorporated into BOP policies. *See* 34 U.S.C. § 30307 (b); *see also Sexually Abusive Behavior Prevention and Intervention Program,* Fed. Bureau of Prisons (June 4, 2015), https://www.bop.gov/pol-icy/progstat/5324_012.pdf (incorporating standards).

*Rape Elimination Commission Report*, Nat'l Crim. Just. Reference Serv., at 73 (2009).[4]  The Commission has noted that being transgender places individuals "at special risk" for sexual abuse in prisons and jails.  *Id.*

### C. The Department of Justice has repeatedly found that transgender women face a heightened risk of sexual assault in male prisons.

Congress mandated that the Department of Justice undertake research and data collection regarding the "incidence and effects" of sexual violence in prison, including identifying the "common characteristics" of victims.  34 U.S.C. § 30303(a)(1).  In doing so, DOJ has documented the particular risk to incarcerated transgender people, concluding that "[r]esearch on sexual abuse in correctional facilities consistently documents the vulnerability of men and women with non-heterosexual orientations and transgender individuals."  *Commission Report*, at 7.  Ample evidence across almost fifteen years of federal research demonstrates the disproportionate and increased risk of sexual violence that transgender people face while incarcerated.

Reflecting this data, DOJ has described the levels of sexual abuse and assault experienced by incarcerated transgender people as "shockingly high."  Office for Victims of Crime, *Responding to Transgender Victims of Sexual Assault*, Office of Just. Progs., U.S. Dep't of Just. (June 2014).[5]  As such, DOJ

---

[4]    Available at https://www.prearesourcecenter.org/sites/default/files/library/NPREC-Final-Report.PDF.

[5]    Available at  https://web.archive.org/web/20250117162658/https://ovc.ojp.

has taken the position that categorical refusals to transfer incarcerated transgender people to housing that corresponds to their gender identity without due consideration of the risks identified by screenings and assessments violate the Eighth Amendment's prohibition on cruel and unusual punishment. Statement of Interest of the United States, at *9, *Diamond v. Ward*, 2022 WL 3221224 (M.D. Ga. 2021), ECF No. 65.

The BOP, too, has acknowledged that incarcerated transgender people are specifically targeted for abuse, identifying "transgender status" as a "risk factor" and "motivating factor" that increases the likelihood of sexual assault.[6] Indeed, although the government now seeks to disavow or deny the substantial risk of sexual violence that incarcerated transgender people face, the government's own numbers do not lie. Only 1.5% of the federal prison population are transgender—and fewer than 1% are transgender women. *See* Brief for Appellants, at 11 (noting that as of February 2025, 2,198 incarcerated transgender people, including 1,488 transgender women, are housed in Bureau of Prison facilities); *Statistics*, Fed. Bureau of Prisons (noting there are over 155,000 total federal inmates).[7] Despite this, 4.3% of all substantiated incidents of inmate-on-inmate sexual violence occurred to transgender people.

gov/sites/g/files/xyckuh226/files/pubs/forge/sexual_numbers.html#victims. Following President Trump's inauguration, the Department of Justice removed this page from its website.

[7] Available at https://www.bop.gov/about/statistics/population_statistics.jsp.

Emily D. Buehler and Shelby Kottke-Weaver, *Sexual Victimization Reported by Adult Correctional Authorities, 2019–2020 – Statistical Tables*, U.S. Dep't of Just., 15 Table 8 (2024).[8]

Federal data on reported sexual victimization also reflects the heightened risk incarcerated transgender people face. Nearly 40% of transgender inmates housed in state and federal prisons reported experiencing sexual victimization—a rate ten times higher than that reported by incarcerated cisgender people. Allen J. Beck, *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011-12: Supplemental Tables: Prevalence of Sexual Victimization Among Transgender Adult Inmates*, Bureau of Just. Stats., Table 1 (2014); Allen J. Beck, et al., *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011-12*, Bureau of Just. Stats., 8 (2013). Over one-third of the reported victimizations of incarcerated transgender people involved inmate-on-inmate sexual violence, and nearly one-sixth involved sexual misconduct by staff. *Id.* at Table 2.

Federal data finding a significantly heightened risk of sexual violence for incarcerated transgender people also align with numerous other surveys on transgender experiences. Incarcerated transgender people are targeted and harassed by staff and inmates because they are transgender. *See* Federica Coppola, *Gender Identity in the Era of Mass Incarceration: The Cruel and*

---

[8] Available at https://bjs.ojp.gov/document/svraca1920st.pdf.

*Unusual Segregation of Trans People in the United States*, 21 Int'l J. Const. L. 649, 656 (2023).  This allows sexual abuse against incarcerated transgender people to thrive in prisons and jails across the United States.  *See Targets for Abuse: Transgender Inmates and Prison Rape*, Just Det. Int'l, 2 (2013).[9]  As such, transgender people face an increased risk of victimization and violence—including "rape, physical violence, and verbal abuse"—while incarcerated. Amanda Graham, *Built Binary: Rethinking the Incarceration of Transgender Individuals Within a Dual-Gendered Prison System*, 58 Ga. L. Rev. 1307, 1314 (2024).  In fact, the 2015 United States Transgender Survey demonstrated that respondents, transgender people who had been incarcerated in the preceding year, were over five times more likely to be sexually assaulted by staff and over nine times more likely to be sexually assaulted by other inmates than incarcerated non-transgender people.  *2015 U.S. Transgender Survey*, Nat'l Ctr. for Transgender Equality, at 1, 15, 191 (2016).  In another survey of transgender incarcerated individuals, a staggering 53% reported they had been sexually assaulted at some point during their current sentence. Vera Inst. of Justice, *Advancing Transgender Justice—Illuminating Trans Lives* 44 (Feb. 2024).

These risks are particularly acute for incarcerated people who will be

---

[9]  Available at https://justdetention.org/wp-content/uploads/2015/10/FS-Targets-For-Abuse-Transgender-Inmates-And-Prisoner-Rape.pdf.

perceived as easy targets—especially transgender women placed in men's facilities, who stand out in an environment almost exclusively comprised of men. The Plaintiffs here have been classified and housed as women, and all receive female hormone therapy, which causes physical changes like breast development. Several have received genital surgeries. The increased risk this poses in not merely hypothetical; several Plaintiffs have been the victims of sexual assault in men's facilities.

In sum, these Plaintiffs' histories and characteristics "mark them as especially vulnerable members of a population that is already uniquely vulnerable to physical and sexual violence in men's facilities." Appellees' Br., at 22. Placing these Plaintiffs in men's facilities, notwithstanding the earlier, individualized analyses that concludes that female housing was the most appropriate option, will place them at substantial risk of future sexual assault. Ample evidence shows that housing these Plaintiffs in men's facilities is "very likely to cause needless suffering" and "give rise to sufficiently imminent dangers." *Helling v. McKinney*, 509 U.S. 25, 33-34 (1993). Officials have an obligation to avoid this result.

## CONCLUSION

In light of the well-known substantial risks of harm faced by transgender women in men's prisons, and these Plaintiffs in particular, amici respectfully urge the Court to affirm the decisions below.

18

Respectfully submitted,

/s/ *Michael J. Mestitz*

MICHAEL J. MESTITZ
WILLIAMS & CONNOLLY LLP
  *680 Maine Ave S.W.*
  *Washington, D.C. 20024*
  *(202) 434-5000*

Richard Saenz
Whit Washington
LAMBDA LEGAL DEFENSE &
EDUCATION FUND, INC.
  *120 Wall Street, 19th Floor*
  *New York, NY 10005*
  *(212) 809-8585*

JULY 7, 2025

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Michael J. Mestitz, counsel for appellant and a member of the Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 32(g)(1) and D.C. Circuit Rule 32, that the attached brief is proportionately spaced, has a typeface of 14 points or more, and contains 3,951 words.

/s/ Michael J. Mestitz
MICHAEL J. MESTITZ
WILLIAMS & CONNOLLY LLP
680 Maine Ave S.W.
Washington, D.C. 20024
(202) 434-5000

JULY 7, 2025

## CERTIFICATE OF SERVICE

I, Michael J. Mestitz, counsel for appellant and a member of the Bar of this Court, certify, that, on July 7, 2025, a copy of the attached brief was filed with the Clerk through the Court's electronic filing system. I further certify that all parties required to be served have been served.

*/s/ Michael J. Mestitz*
MICHAEL J. MESTITZ
WILLIAMS & CONNOLLY LLP
  *680 Maine Ave S.W.*
  *Washington, D.C. 20024*
  *(202) 434-5000*

JULY 7, 2025