**ORAL ARGUMENT SCHEDULED FOR SEPTEMBER 5, 2025**
**Nos. 25-5099, 25-5101, 25-5108, 25-5210, 25-5213, 25-5215**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———————————

JANE DOE, et al.,
              *Plaintiffs-Appellees*,

v.

PAMELA BONDI, in her official capacity as Attorney General
of the United States, et al.,
              *Defendants-Appellants*.

———————————

JANE JONES, et al.,
              *Plaintiffs-Appellees*,

v.

PAMELA BONDI, in her official capacity as Attorney General
of the United States, et al.,
              *Defendants-Appellants*.

———————————

MARIA MOE,
              *Plaintiff-Appellee*,

v.

DONALD J. TRUMP, in his official capacity as President
of the United States, et al.,
              *Defendants-Appellants*.

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

**CONSOLIDATED REPLY BRIEF FOR APPELLANTS**

———————————

BRETT A. SHUMATE
   *Assistant Attorney General*

ERIC D. MCARTHUR
   *Deputy Assistant Attorney General*

CHARLES W. SCARBOROUGH
MCKAYE L. NEUMEISTER
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7231*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 514-8100*

# TABLE OF CONTENTS

**<u>Page</u>**

GLOSSARY

TABLE OF AUTHORITIES ...........................................................................iii

INTRODUCTION AND SUMMARY ...............................................................1

ARGUMENT ......................................................................................... 5

I.   Plaintiffs Have Not Shown A Likelihood Of Success On The Merits. ........................................................................................ 5

    A.   The PLRA Bars this Challenge. ................................................. 5

    B.   The Eighth Amendment Does Not Require BOP to House the Male Plaintiffs in Female Prisons. ...................................... 10

    C.   This Court Should Decline to Address Plaintiffs' APA Claims. ...................................................................................20

II.  Plaintiffs Have Not Satisfied The Remaining Preliminary-Injunction Factors......................................................................... 27

III. The Preliminary Injunctions Violate The PLRA................................30

CONCLUSION .........................................................................................32

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                                    **Page(s)**

*Armstrong v. Schwarzenegger,*
   622 F.3d 1058 (9th Cir. 2010) ............................................................ 31

*Bauer v. FDIC,*
   38 F.4th 1114 (D.C. Cir. 2022) .......................................................... 20

*Booth v. Churner,*
   532 U.S. 731 (2001) ........................................................................... 7

*Carlson v. Postal Regul. Comm'n,*
   938 F.3d 337 (D.C. Cir. 2019) ........................................................... 26

*Chaplaincy of Full Gospel Churches v. England,*
   454 F.3d 290 (D.C. Cir. 2006) ..................................................... 27, 28

*City of Los Angeles v. Lyons,*
   461 U.S. 95 (1983) ............................................................................ 28

*Dalton v. Specter,*
   511 U.S. 462 (1994) ..................................................................... 21, 25

*Farmer v. Brennan,*
   511 U.S. 825 (1994) ............................................... 2, 4, 10, 15, 18, 19

*Fletcher v. Menard Corr. Ctr.,*
   623 F.3d 1171 (7th Cir. 2010) ............................................................ 9

*Hanson v. District of Columbia,*
   120 F.4th 223 (D.C. Cir. 2024) ......................................................... 27

*Hatim v. Obama,*
   760 F.3d 54 (D.C. Cir. 2014) ............................................................ 30

*Hoffer v. Secretary, Fla. Dep't of Corr.,*
   973 F.3d 1263 (11th Cir. 2020) ........................................................ 31

*Murphy v. United States,*
   653 F.2d 637 (D.C. Cir. 1981) ..................................................... 15, 19

*Reliable Automatic Sprinkler Co. v. CPSC,*
   324 F.3d 726 (D.C. Cir. 2003) ..................................................... 22-23

*Ross v. Blake*,
  578 U.S. 632 (2016) ................................................................ 7, 9

*Sherley v. Sebelius*,
  644 F.3d 388 (D.C. Cir. 2011) ......................................... 20, 21

*Sherley v. Sebelius*,
  689 F.3d 776 (D.C. Cir. 2012) ........................................ 25-26

*United States v. Skrmetti*,
  145 S. Ct. 1816 (2025) .................................................... 1

*US Magnesium, LLC v. EPA*,
  630 F.3d 188 (D.C. Cir. 2011) ............................................ 26

**Statutes:**

5 U.S.C. § 704 ...................................................................... 21

5 U.S.C. § 706 ...................................................................... 26

18 U.S.C. § 3621(b) ................................................. 1, 5, 6, 7, 15, 22

18 U.S.C. § 3625 .................................................... 4, 22, 23

18 U.S.C. § 3626(a)(2) ............................................ 5, 21, 30, 31

42 U.S.C. § 1997e(a) ............................................................ 7, 9

**Regulatory Materials:**

28 C.F.R. § 115.41 .............................................................. 23

28 C.F.R. § 115.42(a)-(b) ...................................................... 23

28 C.F.R. § 115.42(c) ................................................ 14, 18, 23, 24

28 C.F.R. § 115.42(g) .......................................................... 24

Exec. Order No. 14168,
  *Defending Women From Gender Ideology Extremism and
  Restoring Biological Truth to the Federal Government*,
  90 Fed. Reg. 8615 (Jan. 30, 2025) ................................ 1, 14, 30

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| BOP | Federal Bureau of Prisons |
| EO | Executive Order |
| JA | Joint Appendix |
| PI | Preliminary Injunction |
| PLRA | Prison Litigation Reform Act |
| PREA | Prison Rape Elimination Act |

## INTRODUCTION AND SUMMARY

The district court erred in barring the transfer of male trans-identifying inmates to men's prisons, as part of the Bureau of Prison's (BOP) implementation of Executive Order (EO) 14168, *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 30, 2025).  The Eighth Amendment does not require the United States to adopt gender ideology and "experimental" concepts like "sex-transition[ing]" in the prison context.  *See United States v. Skrmetti*, 145 S. Ct. 1816, 1844 (2025) (Thomas, J., concurring); *id.* at 1837 (majority) (explaining that sex-transition issues are subject to "fierce scientific and policy debates" and involve "an evolving field").  Nor does the Eighth Amendment force BOP to house men with women, contrary to its legitimate penological interest in protecting the privacy, well-being, and security of female inmates in federal custody.

**I.**    Vacatur of the preliminary-injunction (PI) orders is required because plaintiffs have not shown likely success on the merits of their claims.

**A.**    Plaintiffs' challenge is barred by the Prison Litigation Reform Act (PLRA).  Their Eighth Amendment claims seek review of BOP's decisions to transfer them to certain low-security male facilities, decisions that Congress rendered "not reviewable by any court."  18 U.S.C. § 3621(b).  Plaintiffs'

assertion that they challenge a general policy, rather than their specific housing placements, cannot be squared with the individualized nature of their claims.

Nor have plaintiffs satisfied the PLRA's mandatory exhaustion requirement.  Although BOP's administrative-complaint scheme cannot provide relief immediately or in the precise form sought, it is capable of providing some relief in response to plaintiffs' safety concerns.  Accordingly, plaintiffs must exhaust their claims before suing.

**B.**    Plaintiffs' Eighth Amendment claims also fail on the merits. Plaintiffs are male inmates who have no right to be housed in the facility of their choosing and certainly not when their preferred housing contradicts both their sex and the government's important interests in protecting female inmates' privacy, safety, and dignity.   Plaintiffs' theory of constitutionally mandated special treatment is especially misguided here:  The conditions in the designated low-security male facilities do not pose "a substantial risk of serious harm" to plaintiffs; and even if they did, BOP has not acted with "'deliberate indifference'" to plaintiffs' "health or safety."   *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

**1.**    The district court's understanding of the Eighth Amendment— under which it would constitute cruel and unusual punishment not to

transfer a male inmate to a women's prison anytime he faces an elevated risk of assault in male prisons—is fatally overbroad.  Apparently recognizing that shortcoming, plaintiffs now concede that the Eighth Amendment does not require housing all male trans-identifying inmates in women's prisons.  Plaintiffs' Response Brief (Br.) 19.  And they try to reframe the court's analysis, claiming that it found that plaintiffs face a unique and sufficiently serious risk of harm in male facilities based on plaintiffs' "particular vulnerabilities."  Br.20.  That is not a fair characterization of the decisions below.  As to the risk of violence, the court identified no basis for distinguishing between plaintiffs and the approximately 1,466 other male trans-identifying inmates (representing 99% of all such inmates) who are housed in male BOP facilities.  *See* JA174, ¶ 5.

Plaintiffs contend that the Eighth Amendment compels their special treatment because BOP previously decided to house them in female facilities.  But those decisions were not premised on findings that plaintiffs faced an unconstitutional risk of violence in all male facilities; nor do they foreclose new determinations that plaintiffs can be safely housed in certain low-security male facilities with non-violent offenders.

**2.**    Plaintiffs also have not shown that BOP was deliberately indifferent to the alleged risks in male facilities, because BOP responded

3

reasonably in seeking to abate any such risks. Plaintiffs' argument hinges on the notion that the only constitutionally permissible option is housing these male inmates in female facilities. But the Eighth Amendment does not require the government to disregard legitimate penological interests and endanger female inmates' privacy, safety, and dignity. Far from it: The Eighth Amendment guarantees "'reasonable safety,'" *Farmer*, 511 U.S. at 844-45, not the safety arrangements inmates might prefer. Housing plaintiffs in low-security facilities with non-violent offenders and low rates of assault amply meets that requirement.

**C.** This Court should decline to address plaintiffs' Administrative Procedure Act (APA) claims in the first instance. Given the discretionary nature of preliminary-injunctive relief, it would be particularly improper to affirm PI orders on grounds that the district court has not reached. In any event, the PLRA precludes review of plaintiffs' APA claims. *See* 18 U.S.C. § 3625. And plaintiffs have not shown that BOP's actions implementing EO 14168 were procedurally or substantively improper.

**II.** Plaintiffs also fail to satisfy the remaining PI factors. Their speculative assertions of potential harm do not show sufficiently imminent irreparable injury and are outweighed by important government interests in protecting the safety, privacy, and dignity of female inmates.

**III.**    The operative PI orders also do not contain sufficient PLRA findings that relief is narrowly drawn and the least-intrusive means necessary to remedy the identified harm.  18 U.S.C. § 3626(a)(2).  The district court abused its discretion by entirely barring any transfer to male facilities given the less-intrusive ways available to ensure plaintiffs' safety.

## ARGUMENT

### I.    Plaintiffs Have Not Shown A Likelihood Of Success On The Merits.

#### A.    The PLRA Bars this Challenge.

Plaintiffs' Eighth Amendment claims are squarely foreclosed by the PLRA because they challenge BOP's housing-placement determinations and were not properly exhausted.

**1.**    The PLRA bars judicial review of decisions regarding where to house particular inmates.  18 U.S.C. § 3621(b) ("[A] designation of a place of imprisonment … is not reviewable by any court.").  Plaintiffs' challenge to BOP's decisions to house them in particular low-security male facilities instead of their current female facilities is barred under this provision.

Plaintiffs contend (Br.38-39) that they actually challenge "BOP's categorical policy implementing the Executive Order," not decisions under § 3621(b) designating their housing placements.  That attempted reframing conflicts with the individualized nature of plaintiffs' complaints, *see* JA217

5

(*Doe*); JA360 (*Jones*); JA476 (*Moe*), and with the nature of Eighth Amendment failure-to-protect claims generally. Such claims require an individualized, fact-specific analysis involving the threats faced by specific inmates in specific facilities, and officials' actions to address those risks. It is thus the individual transfer decisions affecting plaintiffs that courts must review, not some general policy in the abstract.

Plaintiffs also assert (Br.39-40) that § 3621(b) does not preclude review of constitutional claims. But the statutory text is unequivocal—it bars review "[n]otwithstanding *any* other provision of law." 18 U.S.C. § 3621(b) (emphasis added). Consequently, at least three circuits have found such claims to be foreclosed. Gov't Br.28-29. Plaintiffs object that those out-of-circuit decisions involved "individualized placement decisions," whereas "constitutional challenges to blanket policies" are not subject to statutory review bars. Br.40-41. But plaintiffs are not pursuing a facial challenge to BOP policy. As explained, their Eighth Amendment claims seek review of their individual transfer decisions. Through those decisions, BOP applied EO 14168's general policy to individual plaintiffs and determined new housing placements—the specific conditions of which, plaintiffs contend, amount to cruel and unusual punishment. Indeed, plaintiffs emphasize (in tension with this threshold argument) that they sought and obtained relief

based solely on their particular "vulnerabilities" and risks, which many other trans-identifying inmates do not share.  *See* Br.19-25.  These are precisely the sorts of claims related to inmate housing that are "not reviewable by any court."  18 U.S.C. § 3621(b).

**2.**    Plaintiffs also failed to properly exhaust their claims through BOP's Administrative Remedy Program before seeking judicial relief.  *See* 42 U.S.C. § 1997e(a).

**a.**    Plaintiffs assert (Br.43) that exhaustion is not required because BOP lacks discretion under EO 14168 to house male trans-identifying inmates in female facilities, and thus lacks "any authority to provide relief." Echoing the district court, plaintiffs erroneously conflate the inability to provide the *precise relief* sought with the inability to provide "'*some relief* for the action complained of.'"  *Ross v. Blake*, 578 U.S. 632, 642 (2016) (emphasis added).    The PLRA requires exhaustion through BOP's administrative-complaint scheme even if that process cannot provide the precise "remedial action an inmate demands"; prison officials only need "authority to take *some* action in response to a complaint."  *Booth v. Churner*, 532 U.S. 731, 736 (2001) (emphasis added).

Here, plaintiffs' Eighth Amendment claims rest on hypothetical future failures by BOP to adequately protect plaintiffs from other inmates in the

male facilities to which they will be transferred. But there are any number of actions that BOP could potentially take to enhance the safety of individual inmates in male facilities, short of housing them in female facilities and endangering female inmates' privacy, safety, and dignity. *See* JA308-10, ¶¶ 11-15. Indeed, plaintiffs do not argue that the conditions are unconstitutionally unsafe for the approximately 1,466 male trans-identifying inmates in male BOP facilities. *See* Br.19; JA174, ¶ 5.

If plaintiffs raised safety concerns through the administrative-complaint scheme, BOP could take action to pursue additional safety measures. Accordingly, it does not matter that "BOP's administrative process is not capable of changing the terms of [EO 14168] or overruling its mandates." Br.44. If, at the end of the administrative process, plaintiffs were still not satisfied with their safety arrangements in male facilities, plaintiffs could then seek broader judicial relief. The district court thus fundamentally erred in concluding that plaintiffs were not required to exhaust administrative remedies due to futility. *See* JA161-63.

**b.** Plaintiffs also ask this Court to recognize a timeliness exception, asserting that exhaustion was not required because plaintiffs "could not have received relief before being exposed to the substantial risk of serious harm posed by transfer." Br.45. But as the Supreme Court has explained, the

PLRA's statutory-exhaustion requirement is "mandatory," and courts cannot graft "unwritten" exceptions onto the "uncompromising statutory text." *Ross*, 578 U.S. at 639-40. Moreover, whereas "§ 1997e(a)'s precursor" required exhaustion only for claims with certain "'plain, speedy, and effective'" remedies, the PLRA's "'invigorated' exhaustion provision" removed the "'speed[iness]'" condition. *Id.* at 640-42.

The Seventh Circuit case cited by plaintiffs (Br.45) does not justify forgoing exhaustion in this case. There, the court acknowledged that there is "no exception" to PLRA exhaustion "for prisoners who allege 'imminent danger.'" *Fletcher v. Menard Corr. Ctr.*, 623 F.3d 1171, 1173 (7th Cir. 2010). The court recognized, however, that under circumstances presenting a discrete time-sensitive danger, where the administrative process cannot provide any relief whatsoever, there is "nothing for the prisoner to exhaust." *Id.* at 1174. The harms alleged by plaintiffs are nowhere near as discrete, certain, or imminent as the exigent circumstances that *Fletcher* recognized could excuse the failure to exhaust. *Compare id.* at 1173 (*e.g.*, if "members of the Aryan Brotherhood were planning to kill [inmate] within the next 24 hours" or inmate was already assaulted and has "untreated wound," and officials refuse to act), *with* JA229-30, 232-34, 700-01, 703-05 (making no

allegations of physical harm to Rachel and Ellen Doe while briefly housed in low-security male facility).

### B. The Eighth Amendment Does Not Require BOP to House the Male Plaintiffs in Female Prisons.

Plaintiffs concede that the Eighth Amendment does not require BOP to house every male trans-identifying inmate in female facilities. Br.19, 28-29. They insist, however, that it would be unconstitutional not to afford plaintiffs such special treatment. That is incorrect. Plaintiffs have not established likely success in demonstrating either (1) that the conditions in the low-security facilities to which they will be transferred will "pos[e] a substantial risk of serious harm" to their health or safety, or (2) that BOP has acted with "'deliberate indifference'" to any such risk. *Farmer*, 511 U.S. at 834. Because plaintiffs must make both showings under the Eighth Amendment, the preliminary injunctions should be vacated.

**1.** Plaintiffs have not demonstrated that placement in any male facility under any circumstances will necessarily subject them to a pervasive and "objectively intolerable" risk of serious harm. *Farmer*, 511 U.S. at 846. Of the male trans-identifying inmates in BOP custody, 99% (approximately 1,466 individuals) are housed in male facilities. *See* JA174, ¶ 5. BOP takes the safety of those individuals seriously and, within the confines of those male facilities, adequately manages the risks they face. Further, plaintiffs do

not dispute that no federal court has ever before held that the Eighth Amendment requires BOP to house trans-identifying inmates in opposite-sex facilities to protect them from the risk of assault. *See* Gov't Br.35-36.

    **a.**    Apparently recognizing that the district court's sweeping understanding of the Eighth Amendment is indefensible, plaintiffs try to rehabilitate the court's analysis. They now concede (Br.19-20) that not every male trans-identifying inmate faces an intolerable risk of violence in male facilities. Plaintiffs claim instead (Br.20) that the court found them to be uniquely situated and face a substantial risk in male facilities based on their "particular vulnerabilities."

    The court did no such thing. Instead, it relied on "various government reports and regulations recognizing that transgender persons are at a significantly elevated risk of physical and sexual violence relative to other inmates when housed in a facility corresponding to their biological sex." JA164-65; *see* JA209 (*Doe*, Second Am. Compl. ¶ 105). Those materials are about the risks faced by trans-identifying inmates *generally*. *See* Gov't Br.36-37. The court's reasoning in reaching this conclusion—which was applied in subsequent PI orders, JA186; JA240-41; JA333; JA445; JA569-70; JA954; JA957; JA960—said nothing about the particular characteristics of plaintiffs, or risks faced by plaintiffs from transfer to the planned low-

security male facilities, that would differentiate them from the 99% of male trans-identifying inmates BOP currently houses in male prisons.

Moreover, plaintiffs' theory continues to encompass *any* male inmate facing high threats of violence in men's prisons because of individual characteristics—such as offense of conviction—so long as a court found him to be particularly vulnerable. But no one could possibly think the Eighth Amendment compels housing those men in women's prisons. *See* Gov't Br.39-40.

As plaintiffs appear to concede (Br.19-20), an undifferentiated conclusion that all trans-identifying inmates face an unconstitutionally grave risk of harm in facilities consistent with their sex would be clearly erroneous. Because that is the necessary implication of the district court's reasoning, this Court should vacate the preliminary injunctions. *See* Gov't Br.35-40.

**b.**    In any event, plaintiffs struggle to articulate why, as a group, they are unique among trans-identifying inmates in facing an unconstitutional risk of violence. Not all plaintiffs have had cross-sex surgery, have always been housed in female facilities, or have experienced violence in male facilities. Br.20. All plaintiffs have had "long-term hormone therapy," Br.20, but the same is true of countless male trans-identifying inmates that BOP

12

has long safely housed in male facilities.[1]  Nor do the medical interventions plaintiffs have received change that plaintiffs are males, and the presence of male inmates in female facilities endangers female inmates' privacy, safety, and dignity.

The only unifying feature plaintiffs identify as grounds for special treatment is that BOP previously chose to house them all in female facilities. In plaintiffs' view, "[t]his distinguishes them both from other incarcerated transgender women and from men who may be vulnerable to sexual assault." Br.20.  But the district court did not rely on BOP's prior placement decisions to support a finding of substantial risk, and for good reason.  *See* JA186-87 (discussing change from prior placements in responding to argument that BOP was not deliberately indifferent (citing *Doe*, Dkt. 52, at 20)); JA446-47 (acknowledging it "may be true" that prior placements were made "for a 'variety of reasons,' and not simply because of a finding that the plaintiffs could not be safely housed in a men's facility," and reiterating earlier discussion (citing JA186)).

---

[1] Although plaintiffs continue to rely on statistics and cases for the proposition that trans-identifying inmates generally "face a high risk of sexual assault and abuse in men's prisons," Br.22 & n.14, they cite no support for the proposition that their particular characteristics create a uniquely heightened risk of violence.

Contrary to plaintiffs' suggestion (Br.20, 22-23), BOP's previous decisions to house plaintiffs in female facilities were not made because plaintiffs were uniquely vulnerable and incapable of being safely housed in any male facilities.  The Prison Rape Elimination Act (PREA) regulations, which impose certain procedural requirements on placement decisions, provide only that BOP must "consider on a case-by-case basis whether a [particular] placement would ensure the inmate's health and safety."  28 C.F.R. § 115.42(c).  Prior determinations that particular placements in female facilities were consistent with ensuring safety do not compel the conclusion that future placements in male facilities would *not* ensure plaintiffs' safety.

Moreover, as explained (Gov't Br.46-47), placements in female facilities under BOP's former housing policy were based on a variety of considerations, not just safety.  For instance, plaintiffs acknowledge that they were seeking to "live as … wom[e]n."  Br.20; *but see* 90 Fed. Reg. at 8615. Under the former policy, male trans-identifying inmates were sometimes housed in female facilities in order "to progres[s] the individual inmate's transition."  JA126.  Indeed, several plaintiffs, including Zoe and Mary Doe, "were placed in a women's facility because they were seeking sex reassignment surgery."  JA393, ¶ 24.

14

Plaintiffs' argument boils down to the extraordinary assertion that once BOP decides to house a male inmate in a female facility (for however long or for whatever reasons), it can never move that person to a male facility. *See* Br.20. But housing placements are not a one-way ratchet; BOP has substantial discretion over such determinations. *See* 18 U.S.C. § 3621(b). Thus, although BOP previously found it would be safe and consistent with PREA to house plaintiffs in female facilities, it has now permissibly determined that plaintiffs "can be safely housed in low security men's facilities." JA393, ¶ 24.

**c.**     In attempting to show a likelihood of exposure to an "objectively intolerable" risk of serious harm, plaintiffs focus almost entirely on their own characteristics. *See* Br.19-25. But the proper focus is on whether the "conditions" of plaintiffs' incarceration pose the requisite risk. *Farmer*, 511 U.S. at 834; *see Murphy v. United States*, 653 F.2d 637, 645 (D.C. Cir. 1981) (considering the "rate of assaults in [a] facility"). As explained (Gov't Br.37-39), the conditions at the low-security facilities to which BOP has designated plaintiffs pose no such risk. In the seven facilities under consideration, "there was only one guilty finding ... of sexual assault ... in 2024," and the rates of assault generally are often lower than the rates in plaintiffs' current facilities. JA390-91, ¶¶ 13-16; JA824-25, ¶¶ 13-16.

Plaintiffs object (Br.24) that some of them have "been assaulted by men in minimum-security men's facilities."  Of the seven plaintiffs alleging prior experience with violence in male BOP facilities (Br.21), only two involved low-security facilities.   Br.9 (citing JA808, ¶ 12; JA382, ¶ 13). Moreover, plaintiffs only identify one of those facilities, JA808, ¶ 12; and it is not one of the seven low-security facilities to which BOP has designated plaintiffs, *see*  JA657, ¶¶ 12-15;  JA710, ¶ 7;  JA747, ¶ 6;  JA823, ¶¶ 7-9. Plaintiffs object (Br.24) that BOP could subsequently move them to higher-security facilities, but such speculation provides no support for their current Eighth Amendment challenge.

**d.**     Plaintiffs also continue to rely (Br.25) on broad assertions that merely being housed in any male facility will exacerbate symptoms of gender dysphoria.  As explained (Gov't Br.40), that is irrelevant because the transfer challenge is premised on a *failure-to-protect* claim, not a *medical-treatment* claim; plaintiffs offered no response.

And again, contrary to plaintiffs' suggestion (Br.20), the district court never found that these particular plaintiffs faced a *unique* risk of worsening gender dysphoria compared to other trans-identifying inmates.  *See* JA165 (citing *Doe*, Dkt. 1, ¶¶ 5, 44); JA187 n.2.  The bare allegations that the court cited for this proposition were entirely generic.  *See Doe*, Dkt. 1, ¶ 44

16

("Plaintiffs will predictably experience worsening gender dysphoria in men's facilities."). The court did not differentiate plaintiffs from the approximately 1,000 other male trans-identifying inmates in BOP custody being treated for gender dysphoria or incongruence. *See* Declaration of Chris A. Bina ¶ 7, *Kingdom v. Trump*, No. 1:25-cv-691 (D.D.C. Mar. 28, 2025), Dkt. 36-1 (Bina Declaration). Plaintiffs have furnished no basis for this Court to make any finding of unique risks to plaintiffs for the first time on appeal.

Moreover, plaintiffs completely ignore the government's argument that even if symptoms worsened, they have not shown that "any change in the severity of symptoms would rise to the level of an Eighth Amendment violation, particularly considering the ways in which BOP could treat those symptoms." Gov't Br.41. Plaintiffs can receive medical treatment for gender dysphoria in male facilities, alongside approximately 1,000 other inmates receiving similar treatment. They have not shown that such treatment exposes them to an objectively intolerable risk of serious harm.

**2.** Plaintiffs also fail to show that BOP is deliberately indifferent to any alleged risks of harm resulting from transfer to male prisons. Indeed, BOP specifically considered those risks and decided to place plaintiffs "at a low security institution with non-violent offenders," which "would minimize the likelihood that they would be victimized." JA100-01, ¶ 12; JA653-54,

17

¶ 12; *see* Gov't Br.42-43.  BOP will further consider safety concerns and how to minimize risks "in making … housing and programming assignments" after plaintiffs have been transferred to those low-security male facilities.  28 C.F.R. § 115.42(c).  BOP has thus "responded reasonably to the risk" faced by plaintiffs.  *Farmer*, 511 U.S. at 844.

Plaintiffs' entire argument on this prong seeks to demonstrate that BOP had subjective knowledge of plaintiffs' alleged "vulnerabilities" and risks.  *See* Br.26-29.  The Court should disregard that straw man.  The government does not dispute that BOP is aware of plaintiffs' characteristics and general statistics regarding the risk of violence in both male and female prisons.  The relevant question on this second prong, however, is whether BOP "disregard[ed] that risk by failing to take reasonable measures to abate it."  *Farmer*, 511 U.S. at 847.  Plaintiffs have not demonstrated that BOP's response to known risks fell below the constitutional minimum set by the Eighth Amendment.

Plaintiffs contend (Br.27) that BOP's consideration of risks in choosing among male facilities is irrelevant, because the "choice not to place Plaintiffs in the most dangerous men's prisons does not cure [BOP's] deliberate indifference."  At bottom, plaintiffs' argument thus presupposes that placement in a female facility is the *only* reasonable response to the alleged

risks, and placement in any male facility under any circumstances is categorically unreasonable. That premise is both unsupported and contrary to Eighth Amendment jurisprudence. The Eighth Amendment imposes a duty to ensure "'reasonable safety'" in prisons, which "incorporates due regard for prison officials' 'unenviable task of keeping dangerous men in safe custody under humane conditions.'" *Farmer*, 511 U.S. at 844-45. Reasonable safety does not mean perfect safety or the safety measures of an inmate's choosing. As this Court has emphasized, "a prisoner has no right to demand the level of protection necessary to render an institution assault-free." *Murphy*, 653 F.2d at 644.

Given those precedents, this Court should reject plaintiffs' contention that it is categorically unreasonable for BOP to respond to the risks plaintiffs fear by transferring them to low-security male facilities with non-violent offenders and low rates of assault, including only one guilty finding of sexual assault in the seven facilities in 2024. JA391, ¶ 16; JA825, ¶ 16. As explained (Gov't Br.43), BOP responded reasonably to safety concerns raised by Rachel and Ellen Doe while they were briefly in male facilities and there is no basis for concluding that BOP would not act reasonably in the future. Nor is there any basis to doubt that BOP will react reasonably in treating any heightened symptoms of gender dysphoria, just as it treats the approximately 1,000

other male trans-identifying inmates who are experiencing gender dysphoria or incongruence in male facilities.  *See* Bina Declaration ¶ 7.  The district court thus erred in concluding that plaintiffs made an adequate showing that BOP acted, or would likely act, with deliberate indifference.

### C.    This Court Should Decline to Address Plaintiffs' APA Claims.

Plaintiffs also ask this Court to affirm on the alternate ground that they have demonstrated a likelihood of success on their APA claims.  Br.29-38.  Because the district court expressly declined to reach those claims, *see* JA158; JA187, this Court should decline to address them in the first instance.  If the Court nonetheless considers this issue, it should hold that plaintiffs have not established a likelihood of success on their APA claims.

**1.**    Because this Court is a "court of review, not of first view," "where the merits went unaddressed below," it is this Court's "general practice to remand to the district court" to address those issues in the first instance.  *Bauer v. FDIC*, 38 F.4th 1114, 1126 (D.C. Cir. 2022) (citation modified).  That practice is particularly important in reviewing preliminary-injunction orders, because "the decision whether to grant a preliminary injunction is a matter of discretion, not a question of right."  *Sherley v. Sebelius*, 644 F.3d 388, 398 (D.C. Cir. 2011).  This Court has explained that, "in every such case, it is for the district court to determine, in the first instance, whether the

plaintiffs' showing on a particular claim warrants preliminary injunctive relief." *Id.*; *see id.* ("[T]he plaintiffs have not identified, nor have we found, any precedent for upholding a preliminary injunction based upon a legal theory not embraced by the district court.").[2]  Because the district court in this case has not exercised its discretion and determined whether plaintiffs' showing on their APA claims warrants preliminary-injunctive relief, this Court should refrain from doing so either.

**2.**    In any event, plaintiffs have not established likely success on the merits of their APA claims.

**a.**    Executive orders are not subject to APA review.  *See Dalton v. Specter*, 511 U.S. 462, 470 (1994) ("The actions of the President … are not reviewable under the APA[.]").  And under the APA, plaintiffs can only challenge "final agency action."  5 U.S.C. § 704.  Accordingly, plaintiffs' APA claims necessarily seek to challenge BOP's specific decisions to transfer each plaintiff to a particular male facility.   *See* Br.30; JA220 (*Doe* Compl.) (challenging "Defendants' decision to transfer Plaintiffs to men's facilities"); JA364 (*Jones* Compl.); JA480 (*Moe* Compl.).

---

[2] Moreover, it is far from clear that affirmance on alternate grounds would be consistent with the PLRA's requirement that the district court make specific findings before granting preliminary-injunctive relief.  *See* 18 U.S.C. § 3626(a)(2).

Under the PLRA's plain text, however, plaintiffs cannot bring an APA challenge to BOP's transfer decisions. Congress provided that "[t]he provisions of sections 554 and 555 and 701 through 706 of title 5"—the APA— "do not apply to the making of any determination, decision, or order under this subchapter." 18 U.S.C. § 3625. Decisions regarding the place of imprisonment of inmates in BOP custody clearly fall within this exclusion of APA review. *See id.* § 3621(b).

Plaintiffs assert that § 3625 does not apply here because they are not challenging "individualized housing determinations," but rather "a broad policy that informs the designation decision[s]." Br.41 (quotation marks omitted). Unlike their cited cases (Br.41-42), however, plaintiffs identify no discrete BOP action, such as a rule or program statement that is properly subject to review under the APA. *See Norton v. Southern Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (limiting review to "discrete agency action").

Rather, EO 14168 established the applicable housing policy, and BOP applied that policy to inmates through individualized placement determinations. Those determinations are the only possible final agency action at issue. They "mar[k] the consummation of the agency's decisionmaking process" regarding how the policy applies to plaintiffs, and have a "direct and immediate effect on [plaintiffs'] day-to-day." *Reliable*

*Automatic Sprinkler Co. v. CPSC*, 324 F.3d 726, 731 (D.C. Cir. 2003) (citation modified).  Challenges to those placement determinations are squarely foreclosed by § 3625.  Accordingly, plaintiffs cannot succeed on their APA transfer claims.

**b.**     Plaintiffs' contention that BOP's placement decisions violate the PREA regulations (Br.30-32) likewise fails.  Those regulations require BOP to screen inmates for their risk of sexual victimization, 28 C.F.R. § 115.41, and to use that information "to inform housing, bed, work, education, and program assignments" and "make individualized determinations about how to ensure the safety of each inmate," *id.* § 115.42(a)-(b).  BOP has complied with that directive in determining plaintiffs' new housing placements.  *See, e.g.*, JA174-77, ¶¶ 10-16, 18, 25.

Plaintiffs' contrary arguments fundamentally misread 28 C.F.R. § 115.42(c).  Plaintiffs contend that this provision "explicitly authorize[s] housing transgender women in women's facilities when doing so promotes safety and security."  Br.7.  In other words, plaintiffs construe § 115.42(c) as requiring BOP to consider opposite-sex housing when making housing placements for trans-identifying inmates.  *See* Br.31, 36.  Because EO 14168 removes the option of opposite-sex housing for male trans-identifying inmates, plaintiffs contend that BOP's implementation of that EO effectively

"repeal[ed] PREA regulations without following the necessary notice and comment procedures."  Br.31-32.

That argument fails because § 115.42(c) does not impose substantive requirements for BOP to leave open the possibility of housing trans-identifying inmates in facilities of the opposite sex, or to evaluate all trans-identifying inmates for such housing.  Rather, § 115.42(c) imposes procedural requirements:  *if* BOP is "deciding whether to assign a transgender or intersex inmate to a facility for male or female inmates," or "making other housing and programming assignments," it must "consider on a case-by-case basis whether a placement would ensure the inmate's health and safety" or "present management or security problems."  28 C.F.R. § 115.42(c).  When the PREA regulations intend to restrict BOP's choices regarding housing for trans-identifying inmates, they do so expressly.  *See id.* § 115.42(g) (eliminating discretion to employ certain housing configurations).  Subsection 115.42(c) does no such thing.

BOP has considered plaintiffs' health and safety on a case-by-case basis in assigning plaintiffs to particular male facilities, and it will continue to do so with respect to housing and programming assignments within such facilities.  That is all the PREA regulations require.

    **c.**    Ultimately, what plaintiffs actually seek to challenge in their APA claims is EO 14168 itself, not BOP's actions implementing its directive with respect to plaintiffs.  *See, e.g.*, Br.35 ("The Executive Order entirely fails to consider an important aspect of the problem[.]" (citation modified)); Br.37 ("[T]he Executive Order declares a federal policy of denying the existence of transgender people.").  But as plaintiffs have acknowledged, *Doe*, Dkt. 13-1, at 19, the APA cannot be used to challenge an executive order.

    Attempting to circumvent that limitation, plaintiffs contend that BOP's *implementation* of the EO is "arbitrary and capricious" insofar as it categorically prohibits housing male trans-identifying inmates in female facilities without sufficient explanation.  Br.33-36.  But that new housing prohibition was a policy judgment made by the President in EO 14168, and review of the President's own policy decisions is unavailable under the APA.  *See Specter*, 511 U.S. at 470.  It follows that, to the extent an agency simply carries out policy determinations made by the President, a court cannot apply APA standards of review to the agency's implementation of those policy judgments any more than it could apply them to the President's order itself.  Doing so would incorrectly imply that the agency had discretion to make the relevant determinations, when in reality it is bound by the President's determinations.  *See Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C.

Cir. 2012) ("[A]n agency under the direction of the executive branch ... must implement the President's policy directives to the extent permitted by law."); *US Magnesium, LLC v. EPA*, 630 F.3d 188, 193 (D.C. Cir. 2011) (rejecting "arbitrary and capricious" challenge where agency had "no discretion" to take desired action under applicable regulations)).  Plaintiffs concede that BOP is in precisely that situation here.  *See* Br.1 ("The Executive Order requires BOP to transfer these women to men's prisons regardless of their individual circumstances."); Br.2 (calling EO 14168 a "categorical mandate").

Contrary to plaintiffs' arguments, nothing in the APA requires BOP to discuss relevant considerations and offer rationales for a policy judgment that has already been made in an executive order.  *Contra* Br.34-36. Whatever BOP ultimately said in such a document, the outcome would be the same: BOP's housing policy in this respect is dictated by the EO.  Viewed another way, plaintiffs cannot demonstrate "prejudicial error" under the APA, 5 U.S.C. § 706, when the agency is legally bound to reach the same result under any circumstance.

To the extent BOP possessed discretion in determining to which male facility it would transfer plaintiffs, its actions were "reasonable and reasonably explained." *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019) (quotation marks omitted).  The APA requires nothing more.

## II.    Plaintiffs Have Not Satisfied The Remaining Preliminary-Injunction Factors.

Plaintiffs have also not met their burden of showing that they are likely to suffer irreparable harm from the transfer and that the balance of equities favors preliminary-injunctive relief.

**A.**    Plaintiffs assert (Br.46-47) that they have demonstrated irreparable harm given their likely success on their Eighth Amendment claim.  That is incorrect, both because they failed to demonstrate a likelihood of success on that claim, *see supra* Part I, and because this Court does not "'axiomatically' find that a plaintiff will suffer irreparable harm simply because it alleges a violation of its [constitutional] rights."  *Hanson v. District of Columbia*, 120 F.4th 223, 244 (D.C. Cir. 2024) (per curiam).

Nor have plaintiffs demonstrated (Br.47-48) that the feared impending injury—physical or sexual violence—is "imminen[t]," "certain and great," in the specific low-security male facilities identified.[3]  *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297-98 (D.C. Cir. 2006) (citation modified).  Some plaintiffs allege (Br.47) that they previously experienced violence in male facilities.  But such past harms generally, and "subjective

---

[3] Indeed, Plaintiff Sophia Doe recently chose to voluntarily dismiss and be transferred to a male facility, which is inconsistent with plaintiffs' alleged fears of imminent violence in such facilities.  *See Doe*, Dkt. 80.

27

apprehensions" of recurrence, are not enough to "establish a real and immediate threat" of repeated assault. *City of Los Angeles v. Lyons*, 461 U.S. 95, 105, 107 n.8 (1983). The experience of "sexual harassment" (Br.47) is also insufficient to infer an imminent certainty of sexual assault; and plaintiffs cite no support for the proposition that harassment by fellow inmates alone constitutes an irreparable injury warranting preliminary-injunctive relief against the government.

Plaintiffs continue to contend (Br.47-48) that they demonstrated irreparable harm because male trans-identifying inmates face an "elevated risk" of violence in male facilities. Even assuming that is true as a general matter, it does not show that these plaintiffs face a likelihood of violence in the specific low-security facilities to which they have been assigned. *See Chaplaincy*, 454 F.3d at 297-98 (no discrete, tangible injury of sufficient imminence where challenged practice only "reduce[d the] *opportunities*" for positive outcome). Indeed, plaintiffs offer no response to the fact that 99% of male trans-identifying inmates in BOP custody are currently housed in male facilities, which undermines any assertion that merely housing such inmates in any male facility necessarily constitutes irreparable harm. *See* Gov't Br.49.

28

Plaintiffs also invoke the district court's bald assertion that housing them in any male facility will exacerbate gender-dysphoria symptoms. Br.48 (citing JA187). But the court never found this to constitute *irreparable harm. See* JA165, 187. Indeed, those symptoms—shared by hundreds of other male trans-identifying inmates in male facilities—are adequately treated by BOP medical personnel. *See* Bina Declaration ¶ 7.

Plaintiffs also point to various declarations setting forth their fears regarding male facilities. Br.48. But as explained (Gov't Br.51-52), subjective concerns alone are insufficient to demonstrate irreparable harm. Plaintiffs must demonstrate a likelihood of tangible harm that is certain and great, notwithstanding BOP's efforts to minimize any risk—for instance, through placements in low-security institutions with non-violent offenders. Plaintiffs have failed to do so.

**B.** Plaintiffs' scant affirmative argument regarding the balance of equities and public interest is premised entirely on an assumption of success on the other PI factors. *See* Br.49 (invoking "harms to [plaintiffs'] physical and psychological wellbeing" and constitutionality of government action). As a result, this factor also weighs against preliminary-injunctive relief.

Plaintiffs suggest (Br.49-51) that this Court need not defer to the government's expertise in the management of the federal prisons, or

recognize its strong interest in implementing new housing policy, because the policy change is based on an executive order rather than agency decision-making. But the President's determination that male trans-identifying inmates cannot be housed in female facilities—to protect the safety, well-being, and privacy of female inmates in intimate spaces when they are in federal custody—is consistent with BOP's expert policy judgment. *See* 90 Fed. Reg. at 8615-16; JA392-93, ¶¶ 20, 23; JA826-27, ¶¶ 20, 23.

In any event, the origin of the Executive Branch policy judgment here— directly from the President—counsels even more strongly *against* judicial interference. This Court has frequently noted that the government is owed "'wide-ranging deference'" in the management of federal prisons. *See Hatim v. Obama*, 760 F.3d 54, 59 (D.C. Cir. 2014). The district court abused its discretion in failing to afford such deference to BOP's placement determinations and its preliminary injunctions are thus contrary to the public interest.

## III.  The Preliminary Injunctions Violate The PLRA.

The district court's cursory discussion of its compliance with 18 U.S.C. § 3626(a)(2) is insufficient under the PLRA.

Plaintiffs contend that the operative PI orders are sufficient because the PLRA does not require "a provision-by-provision explanation of a district

court's findings." Br.52 (quoting *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1070 (9th Cir. 2010)). But even if "each individual element of" a PI order need not have dedicated "need-narrowness-intrusiveness findings," *Armstrong*, 622 F.3d at 1070, those findings are still required for the preliminary injunctions as a whole. And mere "'summary conclusions'" do not suffice. *Hoffer v. Secretary, Fla. Dep't of Corr.*, 973 F.3d 1263, 1278 (11th Cir. 2020) (alteration omitted).

Summary conclusions are all that the operative PI orders offer. JA955, 958, 961.[4] For instance, the orders contain no specific factual findings regarding the harm that relief is necessary to address, or why other less-intrusive means would not correct that harm. Contrary to plaintiffs' suggestion (Br.52-53), the court did not specifically consider whether there were less-intrusive ways to avert the feared harms of housing in a male facility, nor did it specifically consider any possible alternatives and find them insufficient. The court's bare conclusion that barring transfer to any male facility was "the least intrusive means necessary to correct [the] harm," JA955—notwithstanding the approximately 1,466 male trans-identifying

---

[4] The original PI orders expired after 90 days. *See* 18 U.S.C. § 3626(a)(2). The district court issued renewed preliminary injunctions with the same scope, based on its prior holdings. JA954-56, 957-59, 960-62. The government appealed from those orders and the appeals were consolidated.

inmates that are appropriately housed in male BOP facilities—was clearly erroneous. In issuing preliminary injunctions with such broad scope, the court thus violated the PLRA and abused its discretion.

## CONCLUSION

For the foregoing reasons, the preliminary-injunction orders should be vacated in part.

Respectfully submitted,

BRETT A. SHUMATE
 *Assistant Attorney General*
ERIC D. MCARTHUR
 *Deputy Assistant Attorney General*
CHARLES W. SCARBOROUGH

 */s/McKaye L. Neumeister*
MCKAYE L. NEUMEISTER
 *Attorneys, Appellate Staff*
 *Civil Division, Room 7231*
 *U.S. Department of Justice*
 *950 Pennsylvania Avenue NW*
 *Washington, DC 20530*
 *(202) 514-8100*
 *McKaye.L.Neumeister@gmail.com*

July 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6474 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Georgia 14-point font, a proportionally spaced typeface.

*/s/ McKaye L. Neumeister*
McKaye L. Neumeister

## CERTIFICATE OF SERVICE

I hereby certify that on July 21, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

_/s/ McKaye L. Neumeister_
McKaye L. Neumeister